IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SCOTT and ANNETTE McCLELLAN,<br><br>　　　Plaintiffs,<br><br><br><br>　　　vs.<br><br><br>UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, BUREAU OF RECLAMATION; COMMISSIONER; BILL RINNE, in his capacity as Acting Commissioner; CENTRAL UTAH WATER CONSERVANCY DISTRICT, a Utah political subdivision; and DOES 1 THROUGH 20,<br><br>　　　Defendants. | DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br><br><br>Case No. 2:06-CV-634 DB<br><br><br>Judge Dee Benson |

This Decision follows a bench trial that was held on December 13, 20 & 21, 2010.[1] Wade R. Budge and M. Lane Molen represented the plaintiffs. The United States of America Department of the Interior, Bureau of Reclamation, and the federal officials named in the pleadings were represented by Amy J. Oliver and Jared C. Bennett. The Central Utah Water Conservancy District was represented by Edwin C. Barnes and Katherine E. Judd. There were three issues for trial: 1) whether the defendants' proposed activities are reasonably necessary to the operation and maintenance of the Timpanogos Canal; 2) whether the trees and shrubs planted by the plaintiffs near the canal and the plaintiffs' garage trespass on the canal easement; and 3) whether the plaintiffs' trees along the canal constitute a public nuisance.

## Background Facts and Litigation History

In 1989, Scott McClellan purchased a 5-acre lot in the Wasatch View Acres development in Heber, Utah. (Uncontroverted Facts, g.) The Timpanogos Canal runs through it. The canal was originally constructed in 1895 by Mormon pioneers. The canal is approximately 12 miles long and is essentially an earthen ditch that is 8 to 10 feet wide and approximately 5 feet deep. (Tr. at 31; Pls.' Ex 3.) It runs through the entirety of the McClellan property with the water flowing from the north end to the south end, with about one-third of the McClellan property lying west and on the downslope side of the canal. (Tr. at 116-17.) The canal is perched; that is, it is not on flat ground. The degree of the slope is not severe; if there was a breach, gravity would take the water downhill to the west. (Tr. at 41.) The McClellan acreage below the canal contains no structures or buildings and ends at a county asphalt road. The area immediately west

---

[1]Reference to the trial transcript will be cited as "Tr. at __." Reference to the Uncontroverted Facts contained in the parties' Pretrail Order, Dkt. No. 98, will be cited as "Uncontroverted Facts, __."

of the county road is at present unoccupied.  On the two-thirds of the McClellan property above
the canal sits the McClellans' house, which they built themselves in 1993, and a garage which is
located approximately 8 feet from the eastern canal bank.  (Tr. at 35-36, 114-17.)  The
McClellans' private driveway crosses the canal by a bridge.  A photograph of the property
appears below.



(Pls.' Ex. 4.)

From the time the McClellans built their home until 1998, the canal was owned and

operated by the Timpanogos Irrigation Company. During this time routine maintenance was performed on the canal, usually by Mr. John Witt. (Tr. at 307-08.) His activities generally consisted of removing debris, cutting excess grass and weeds, and ensuring that the canal banks were in good condition. He inspected the McClellan property on foot and when necessary operated a rubber-tired backhoe within the prism of the canal, entering and exiting the canal wherever it was convenient. He gained access to the property by way of the adjacent public roads and the McClellans' driveway. He brought in trucks and other equipment as necessary for maintenance and repairs. There were never any problems or disputes between the McClellans and the canal owner during this time period. (Tr. at 117-18, 121, 308-13.)

In 1998, the United States became the owner of the canal. The United States Bureau of Reclamation is responsible for its overall management. The Central Utah Water Conservancy District (hereinafter "the District") was retained by the new owner for the day-to-day oversight, operation, and maintenance of the canal. (Tr. at 237-38.)

The source of water in the Timpanogos Canal is the Provo River. (Uncontroverted Facts, a.) In 1995 the Jordanelle Reservoir was constructed on the Provo River upstream from the canal. The Reservoir is part of the Central Utah Project and currently is within the Wasatch County Water Efficiency Project. Since the creation of the Jordanelle Reservoir and dam project the water that flows in the canal is distributed from the Jordanelle Reservoir. From its inception in the late 1800s, the canal has been designed to carry a maximum of approximately 70 cubic feet per second. There is river water in the canal generally from April to October serving customers for irrigation, and municipal water purposes. (Tr. at 564; Pls.' Ex. 10 p. 33-34.) The canal's average flow rate in the busiest summer months of July and August is approximately 40 to 50

4

cubic feet per second.  (Pls.' Ex. 10 p. 33-34; Tr. at 380.)

The history, as far as it is known, of this 100-year-old canal is free from any serious breaches.  (Tr. at 293, 313, 438.)  For most of its history it has run through farm and ranch lands. In recent years, as illustrated by the McClellans' 5-acre purchase, the area in and around Heber City, located in Wasatch County, has seen considerable growth of urban and suburban developments.  The population of Wasatch County in 1950 was 5,574; it stands at approximately 21,600 today.  (Defs.' Ex. I)

The present dispute centers on the activities that occurred after the canal became the property of the United States in 1998.

## The 1998 Offer

Shortly after the United States became the owner of the canal, the Bureau of Reclamation sought to purchase a 60-foot wide perpetual easement from the McClellans to "construct, reconstruct, realign, enlarge, improve, relocate, repair, operate, and maintain the Timpanogos Canal . . . and appurtenant structures."  The McClellans were offered between $20,000.00 and $21,000.00 for the easement, which would have encompassed approximately twenty to twenty five percent (20-25%) of the McClellan property.  (Defs.' Ex. N; Tr. at 122-24, 161.)

Around the same time, the Bureau sought to purchase similar easements from other landowners whose properties were traversed by the canal.  Eventually, approximately 50 of those landowners reached an agreement with the Bureau with payments ranging from $800.00 to $215,470.00.  (Pls.' Ex 7; Tr. at 125.)

Mr. McClellan considered the Bureau's offer to purchase a 60-foot wide easement over his property, but he declined it because he did not believe that he received satisfactory answers to

his questions regarding the way the government planned to use the land in the future. (Tr. at 126-29, 173-74.)

**The Garage**

In 2002, the McClellans decided to build a rather large stand-alone garage between their residence and the canal. (Tr. at 133.) They sought a building permit and were told by various officials that the garage could not be approved as designed because it was too close to the canal. (Tr. at 133-37.) The McClellans disagreed and a rather protracted process ensued during which a settlement was attempted that would give additional land to the canal company relative to the canal easement. A settlement, however, was not reached and the dispute ended with no resolution. Despite the objections from the District, the McClellans built their garage anyway, with its nearest corner approximately 8 feet from the uphill bank of the canal. (Tr. at 35-36.) District officials claim it is too close to the canal, in violation of a city ordinance, and interferes with the easement rights of the canal owner. The McClellans claim they are entitled to build their garage where it sits and that it poses no risk to the canal. They claim that there has never been any canal maintenance of any kind carried out on or near the garage site nor is it foreseeable that the area above the canal would ever be needed to perform canal operation or maintenance work. The District claims that in the event of a major event it could become necessary to operate a backhoe or other heavy machinery in the area of the garage and that such an operation would be impossible given the narrow passage between the corner of the garage and the canal. The defendants claim the garage is trespassing on the canal easement.

**Trees and Shrubs**

The District officials also complain that the McClellans have planted trees and other deep-

rooted foliage too close to the canal on both the uphill and downhill sections of their property. The McClellans have, in fact, planted approximately 18 trees and various shrubs near the canal. The closest tree on the uphill slope is located 7 feet from the canal, and on the downhill slope, the closest tree is 12 feet from the canal. (Tr. at 151-52, 169-71, 178, 180.) The McClellans claim this is not an unreasonable use of the servient estate and does not constitute a nuisance or in any way interfere with the canal easement. The defendants claim the trees constitute both a nuisance and a trespass.

### The 2006 Incident

On July 31, 2006, the District sent a crew with a backhoe to the McClellan property for the purpose of removing some of the trees and apparently to begin constructing an access road. (Uncontroverted Facts, m.) Upon seeing the activity, the McClellans called their attorney who notified the county sheriff who responded a short time later. (Tr. at 143, 156-58, 164-65.) The McClellans insisted the District had no right to remove the trees or build a road. The District obviously believed otherwise. Since that time the District has not returned to the McClellan property for any purpose including the routine maintenance that had been conducted in the past. The McClellans claim they have never denied the District access to their property to perform necessary operation and repair activity on the canal. They only object to unnecessary operations. The District contends their tree removal and other actions were necessary and that they have the right to perform them.

### The Road

The most serious dispute among the parties is the defendants' desire to build a maintenance road alongside the canal through the length of the McClellan property. The

defendants assert that such a road is necessary for effective management and operation of the canal. During the period from 1998 to the present the United States began constructing such a road along much of the Timpanogos Canal. As described above, this was accomplished largely on the sections of land the United States acquired from the various landowners along the canal through the purchase of additional easements. The United States contends that these purchases were not legally required, and that pursuant to their canal easement they have the right to build the road without any compensation to the landowners. They claim the arrangements were made with the landowners to show good faith, foster good relationships and avoid disputes. The result of these agreements is that at the time of trial the United States had an access road alongside, or a short distance from, the canal on roughly 80% of its 12 mile length. The propriety of these agreements is not at issue here, although the court may harbor some doubts about the government's legal position. Nevertheless, they have relevance here to help explain the background of the present dispute. When the July 2006 backhoe incident occurred, the United States had already constructed access roads on the property of the McClellans' immediate neighbors, both on the north and the south, and had informed the McClellans that they have the right to connect these roads by a road across the McClellan property.

**The Lawsuit**

That brings us to this lawsuit. The McClellans contend that the defendants' easement rights do not allow them to cut down their trees, prevent them from building their garage (or cause it to be removed), or to build a road through their property. They claim that none of the defendants' actions and proposed actions are reasonably necessary for the continued safe operation of the canal. The defendants, on the other hand, contend that their proposed actions on

8

the McClellan property are not only reasonably necessary to safely operate and maintain the canal, but also to comply with Utah Code Annotated § 73-1-8, that requires them to "maintain [the canal] to prevent waste of water or damage to the property of others."

**The Law**

After considerable briefing by the parties, the law that controls the decision in this case is quite clear and straightforward. With respect to the canal owner's proposed activity, the controlling Utah state law focuses on whether the activities are "reasonably necessary" to operate and maintain the canal, with due regard paid to the burden caused to the serviant estate by such activities. *See North Union Canal Co. v. Newell*, 550 P.2d 178 (Utah 1976); *Salt Lake City v. J.B. & R.E. Walker, Inc.*, 253 P.2d 365 (Utah 1953); *Big Cottonwood Tanner Ditch Co. v. Hyland Realty, Inc.*, 334 P.2d 755 (Utah 1959); *Holm v. Davis*, 125 P. 403 (Utah 1912).

Similarly, with respect to the McClellans' activities involving tree-planting and their garage, the focus is whether such use of their property unreasonably interferes with the operation and maintenance of the canal.

Whether delineated a "secondary easement," an "incidental right," or simply a right that attaches to the original prescriptive easement, the parties appear to generally agree that the ultimate issue in this case is whether the proposed activity is "reasonably necessary" to the operation of the canal. A brief summary of each of the parties' descriptions of the controlling legal standard is set forth below.

Defendant United States described the applicable Utah law as follows:

> The common law allows a secondary easement holder to use new land when reasonably necessary to accommodate the changes in land use and technology that occur over time so that the easement holder can make the most effective and efficient use of his easement. The Restatement (Third) Property nicely illustrates this point.

It states, in relevant part:

> The holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. The manner frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited [sic] by the servitude. Unless authorized by the terms of the servitude, the holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment.

Restatement (Third) Property, § 4.10 (2000).

\*     \*     \*

> The common law's recognition that a secondary easement holder may use new land when reasonably necessary is based on sound public policy and equitable principles. First, sound public policy reasons demand that secondary easement holders along a canal be able to use new land when reasonably necessary to access, operate, and maintain the canal. As the common law and the Utah Supreme Court recognize, land use around canals can change over time from agricultural to urban. *Big Cottonwood Tanner Ditch Co. v. Hyland Realty, Inc.*, 334 P.2d 755, 756 (Utah 1959); Restatement (Third) Property, § 4.10. This change in the servient estate's use can impose several burdens on a canal owner . . . . Given these increased burdens on the canal owner, the common law appropriately recognized that a secondary easement holder must be able to use new land when such use is reasonably necessary to access, operate, and maintain the canal in order to protect the very people who have moved to the canal and made the canal owner's job more difficult in the first place.

(Def. United States' Supplemental Brief, Dkt. No 78 at 2-3.)

Similarly, defendant Central Utah Water Conservancy District explained the legal

standard in the following manner:

> Utah case law on easements, and particularly canal easements, varies primarily with language used by the authoring justice. Some reported cases are straight-forward, other are filed [sic] with flowery or arcane descriptions. Read carefully, however, they are remarkably consistent in holding that the canal easement is the dominant estate, which carries with it the right (indeed, the duty under Utah law) to use so much of the surrounding land on both sides of the canal as is reasonably necessary from time to time for the operation, maintenance, and repair or reconstruction of the canal. This right pertains whether the canal has been so

10

maintained in the recent past, and the canal operator's maintenance obligations increase with increasing risk of adjacent development.

(Def. Central Utah Water Conservancy District's Supplemental Memorandum, Dkt. No. 77 at 4.)[2]

And, using this same general approach, the plaintiffs agreed that "[a] secondary easement may only be invoked when there is no other reasonable means to protect the primary easement. This principle is consistent with Utah law." (Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Federal Defendants, Dkt. No. 76 at 5-6.)[3]

_____

[2]By the time of trial the defendants had apparently abandoned their insistence in earlier briefing on a precise dimension of the canal's prescriptive easement. There is no discussion of specific boundaries in either of the defendants' supplemental briefs. In any event, even if the defendants were to assert the existence of a specific dimension (such as 40 feet on each side of the canal) they appear to agree that any activity within that area would still need to be reasonably "necessary for full enjoyment of the easement and to accomplish the object of the easement." (Def. Central Utah Water Conservancy District's Supplemental Memorandum, Dkt. No. 77 at 8; *see also* Def. United States' Supplemental Brief, Dkt. No 78 at 11.)

Furthermore, the court ruled before trial that even if such a precise prescriptive easement measurement were pertinent to the case, the defendants had failed to come forward with sufficient facts to support such precise boundaries.

[3]The plaintiffs claim in their memoranda that the defendants are not entitled to take "more or different land" from the servient estate, and that the defendants' proposed actions constitute such a taking. The plaintiffs seem to be asserting that if the dominant estate holder uses any "new" land beyond the "historic use" that such activity may not be considered an incidental or secondary right to the easement, even if it qualifies as reasonably necessary for the operation and maintenance of the canal and does not unnecessarily burden the servient estate. (Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Federal Defendants, Dkt. No 76 at 14.)

To the extent plaintiffs are making such an argument, the court rejects it. While it is clear that an easement holder may not take land that is different from the original easement (an example would be a complete change in the location of an irrigation ditch as in *White Bros. & Crum Co, Ltd.*, *v. Watson*, 117 P 497 (1911)) it may, consistent with Utah case law, expand the width of the historic use if "reasonably necessary" for the enjoyment of the easement, consistent with its historic use (that is, to safely conserve and transport water down the canal) and it does not unnecessarily burden the servient estate. In this regard, the court agrees with the position

To the extent that there remain minor disagreements among the parties as to the current

state of Utah law regarding canal easements, they do not alter the central question of "reasonable

necessity" in the resolution of the instant case. Accordingly, the trial centered on the reasonable

---

advanced by the defendants in their supplemental brief:

> By using "reasonable necessity" instead of "historic use" as the standard and by
> relying solely on expert testimony as to the needed width of the secondary
> easement, it is logical to conclude that Utah will follow the common law and
> other jurisdictions like Colorado to determine the rights of the secondary
> easement holder.

(Def. Central Utah Water Conservancy District Supplemental Memorandum, Dkt. No 77 at 6-7.)

Plaintiffs rely on an Idaho case, *Abbott v. Nampa School District No. 131*, 808 P.2d 1283
(Idaho 1991), for their position. However, a close reading of that case demonstrates that it is
consistent with the "reasonable necessity" approach accepted by the court here, and does not
stand for the proposition that *any* increase in the *amount* of land used to maintain and operate the
easement must be acquired, if at all, via condemnation and eminent domain.

Indeed, from the position plaintiffs take in their latest supplemental brief, it is not entirely
clear that they remain committed to their earlier pronouncements. In their reply to the
defendants' supplemental briefs they state:

> An easement holder's use rights only exist to the extent necessary for the enjoyment
> of the easement. This language is critical. The government would have this Court
> twist this language– language to protect the intended enjoyment of the easement –
> to mean that an easement holder may make any use and take any amount of new
> property reasonably necessary to make its maintenance and repair obligations more
> convenient and less costly. The question before this Court is whether the new land
> and improvements are necessary to enable the government to be able to continue to
> enjoy the Canal – i.e., to transport water through the Canal.
>
> While it may be more convenient and less costly for the government to drive
> their vehicles on a road alongside the Canal and in the middle of the McClellans'
> Property, the standard is not that the government is entitled to any land which they
> can show is reasonably necessary to make their maintenance obligations as
> convenient as possible. Rather, the new use and new property and improvements
> must be necessary for enjoyment of the easement. There is no contention by the
> government that it will be unable to continue to transport water through the Canal in
> a reasonably safe manner as has been done for over 100 years without the access
> road.

(Plaintiffs' Combined Supplemental Reply Memorandum in Support of Plaintiffs' Motion for
Summary Judgement Against Federal Defendants, Dkt. No. 81 at 9-10.)

necessity of the defendants' proposed activities on the McClellan property. This required attention not only on the obvious inquiry as to <u>why</u> the canal owner feels it is necessary to perform the proposed activity, but also on the burden such activity places on the servient estate. A determination of "reasonable necessity" must focus on both these factors. A proposed activity may appear "reasonable" and "necessary" if viewed only from the perspective of the canal owner, but may become less so when considering the effect on the servient estate. The reasonable necessity of a road alongside a canal through vacant pasture land would be assessed differently than a road next to a canal that runs through someone's backyard. As the Utah Supreme Court stated in *Valcarce v. Fitzgerald*, "further reasonable efforts to conserve water [can] be made by an easement owner so long as they [do] not unnecessarily burden the servient estate." 961 P.2d 305, 312 (Utah 1998).

Consistent with this legal structure, during the trial, the court, as the finder of fact, was particularly focused on evidence that addressed both 1) the reasons why the canal owner felt its desired construction of a maintenance roadway, and the other disputed activities, were necessary and 2) the effect such actions would have on the McClellan property. Again, the law requires a consideration of the balance between the rights of the dominant estate (the canal easement holder) and the servient estate (the McClellan property). As such, it is a decision that is almost entirely factual. Its resolution will vary depending on the unique facts in every situation.

By the time of trial, after all of the briefing and discussion, and following a site visit to the property, it was apparent the principle difference between the parties was whether the defendants' proposed construction of an access road was a reasonable necessity or merely a desired convenience.

With regard to the burden of proof, both sides agreed the United States bore the burden of proving the scope of its easement. The plaintiffs claimed the proof should be by clear and convincing evidence, citing *Buckley v. Cox*, 247 P.2d 277 (Utah 1952). The defendants argued for a preponderance of the evidence standard, pursuant to *Merrill v. Bailey and Sons Co.*, 106 P.2d 255, 258 (Utah 1940). The court is persuaded the proper standard in this case is the preponderance standard.

**The Trial**

At trial, the plaintiffs presented six witnesses: Mr. Scott McClellan; Mrs. Annette McClellan; David Krueger; Edward Vidmar; John Witt; and Russell O. Brown, who was presented as an expert witness.

The defendants presented six witnesses: Edward Vidmar, Kent Berg, Devin McKrola, Don Wood, Larry Hartley and Wynn R. Walker, who was designated as an expert witness.

**The Plaintiffs' Case**

The plaintiffs' case in chief consisted primarily of testimony from the McClellans regarding the history of their use of their property, and the opinions of their expert, Mr. Brown. In addition they called as witnesses David Krueger, Edward Vidmar, and John Witt.

Scott McClellan testified that he did not agree to the United States' $20,000.00 offer for a larger easement in 1998 because "there was really no definition as to what they were going to do with that land that they acquired." (Tr. at 126.) He explained that the government's proposed acquisition constituted approximately 20-25 percent of his property. (Tr. at 160-61.) Each of the McClellans testified as to their observations of the activities of the canal owners in maintaining the canal on their property both before and after the United States purchased the canal in 1998.

They described Mr. John Witt's maintenance efforts as they observed them in the years between 1989, when Scott McClellan purchased the property, until 1998. During that time Mr. Witt worked on behalf of the then-owner of the canal, the Timpanogos Irrigation Company. They described Mr. Witt's use of a "skid loader" and a backhoe to perform maintenance and clearing activities. They testified that these activities took place primarily within the prism of the canal. They claimed the area where the garage was built was never used in connection with any canal maintenance operations. (Tr. at 118, 121-22.)

The McClellans testified that in their view the proposed road is not necessary for the operation and maintenance of the canal and pointed out that the canal has been properly maintained without such a road during their ownership of the property. They presented evidence that to their knowledge in the 100-plus year history of the canal there have never been any breaches of or significant problems with the canal on their property. (Tr. at 118, 154-55, 168-69, 293, 313, 438.)

The McClellans testified that they recognize the canal owner's right to install a concrete liner inside the canal prism. They claim that the concrete liner would dramatically reduce, if not eliminate, any risks of breach, seepage and other operational risks associated with the canal, and that a concrete liner will substantially reduce the amount of maintenance required in the canal.

The plaintiffs' expert was Russell O. Brown, a professional civil engineer with many years of experience in canal operations, including in particular the Provo Bench canal since 1967. He described the physical characteristics of the Timpanogos Canal and expressed his opinion that the maintenance of the canal can be safely performed within the canal prism. (Tr. at 33.) He stated that in his opinion the garage does not interfere with the canal.

Well, when I look at the kind of maintenance they might do on the canal, as I look at the maintenance and the canal in the condition it is in, you know, you are probably going to be trimming some of the willow down that grow on the bank or something, but all of this would be done with the water out and when the canal is not in service. I don't see any reason to have any equipment on the banks of that canal in order to maintain it.

(Tr. at 36.)

Mr. Brown saw no problem "at the moment" with the McClellans' small trees near the canal. (Tr. at 37, 38.)

Regarding the proposed access road, Mr. Brown stated that, "except for the convenience of maybe perhaps the operating personnel . . . I see absolutely no reason whatsoever to have a road along the canal on the McClellan property." (Tr. at 39.)

He explained his reasoning:

Well, if you are going to have a road for maintenance, you presume that you're going to then have a backhoe or something that would walk along that so that you could reach down in there and clean something out when the water is in there. In the first place, you know, I don't see that there is anything ever been trapped in that canal.

In the second place, if it is floating in the canal it is not very big, and so you can just get in and take it out. I don't see any real reason, except if you're going to line that, you might want to work a backhoe on the bank while you build it. For maintenance – I just don't see maintaining the canal with a back hoe from the bank.

(Tr. at 39, 40.)

Regarding safety concerns in connection with an access road, he testified:

Q.    In your opinion would a road on the downhill slope here make the canal safer?

A.    I think it would make it more dangerous.

Q.    Why is that?

A.    Well, you provide access. You provide access and so kids on four-wheelers can flip over the bank and drop in the canal. You can put up gates and try to fence

16

them out, but that is the reason all the ones in Orem are fenced on both sides is just to keep the kids out and some adults.

Mr. Brown further opined regarding seepage:

Q.     Do you have an opinion as to whether a road and the material that would be supporting the road would prevent the canal from seeping –

A.     I don't –

Q.     – in this section?

A.     Having a road on the top of that is not related to seepage one way or the other.

Q.     Can you explain to the Court why that is not related to seepage?

A.     Well, seepage depends on the hydraulic gradient, and the hydraulic gradient would be downward, and so if you're going to seep out of that canal, it is either going to seep vertically or it is going to seep horizontally.  The seepage would never be above the water level.  The water level is going to be a couple of feet, and so if you have seepage out of the canal on that downhill side, it is going to go on an angle down to the west, starting about at the bottom of the canal.
       It probably, if it seeps now – I walked over those slopes and there is no evidence that there has ever been seepage out there.  It could seep but the seepage has never surfaced, at least by the time you get to the asphalt road.  It does not appear that there has ever been seepage out of that canal on that slope

.

Q.     So you are saying you didn't observe seepage on the McClellans' property?

A.     No.

Q.     Now, would the fact that the canal is lined change the way it is operated or inspected?

A.     Well, I think if you line it, of course, then there is not any possibility of seepage, at least the way it has been lined on the other end, and you eliminate the possibility of seepage.  Lining also probably reduces the need to ever get in the canal to trim and maintain the cross section, and so you probably reduce the amount of maintenance required by lining it.

(Tr. at 40, 41.)

Mr. David Krueger, the Bureau of Reclamation's chief of the lands group, testified

briefly during the plaintiffs' case. His testimony related generally to the history of the Bureau's acquisitions of additional land under easement agreements with landowners along the canal. He also provided background information related to the Bureau's objection to the location of the McClellans' garage. (Tr. at 76-77, 86, 96, 103-08.)

Mr. Edward Vidmar, the manager of the resource management division of the Provo, Utah area office of the Bureau of Reclamation was called to testify during the plaintiffs' case. He was also a witness for the defendants. He testified that there is no specific Bureau of Reclamation requirement for a road along the canal and agreed that certain "geographic" and other features such as pipes may prevent the construction of a road. (Tr. at 194.)

Mr. Vidmar testified in response to questions from the defendants that he has "safety concerns" that the canal's downhill embankment on the McClellan property is too narrow and therefore poses a risk of breach which could place the downstream population at risk. (Tr. at 203.) He expressed the Bureau's desire to address this safety concern by increasing the width of the downslope embankment and bringing in sufficient "engineered fill" to construct a road that would serve as a staging platform for safety operations and also for maintenance purposes. He did not base his opinions on any engineering or other studies, but rather on his experience. (Tr. at 209, 210.)

Mr. John Michael Witt was the plaintiffs' final witness. He provided details of his 25 years of experience maintaining the canal, generally corroborating Mr. McClellan's account of his activities. He usually worked a backhoe from within the canal prism to clean out debris when the water was out of the canal. He would gain access to the canal from the McClellan driveway and the adjacent public roads. (Tr. at 308-13.)

18

**The Defendants' Case**

In addition to Mr. Vidmar, the defendants called five witnesses: Kent Berg, Devin McKrola, Don Wood, Larry Hartley and Wynn R. Walker, who was designated as an expert Witness.

Mr. Berg is the public works Director and the Emergency Management Director for Wasatch County. He testified generally about the county's canal systems and their importance in handling flood events. He stated that if a concrete liner were installed in the Timpanogos Canal it would significantly eliminate risks of breaching.

Mr. McKrola is a project manager with the District. He received a bachelors degree in civil and environmental engineering at Brigham Young University in 1997. He explained that the District has designated the McClellan property as a high risk area for canal failure. He prepared an exhibit, received as Exhibit D, that depicts "what may potentially happen if there [is] a failure" of the canal. (Tr. at 368, Defs.' Ex. D.) He testified that if there is a major breach of the canal on the McClellan property the escaping water would flow downhill to the Wasatch Canal, which would also likely breach because of the additional load, and then there would be serious flooding problems involving many properties, including a large number of residences in the town of Heber. He described in detail the operations of the Wasatch and Timpanogos canals and discussed past incidents involving breaches, including a sinkhole situation on the Lecee property located approximately 1,000 feet downstream from the McClellan property. He testified that the condition of the bottom of the canal in that location is similar to the conditions on the McClellan property.

Regarding the downslope canal bank on the McClellan property, Mr. McKrola testified:

Q. What do you feel, as an engineer and operator of the canal, needs to be done to that canal bank?

A. That canal bank needs to be cleared of detrimental vegetation, examined for what type of material is there, and really fully reconstructed and stabilized to make it proper as an earth canal bank.
What would be optimum for our operation would be to concrete line that section to avoid seepage losses from the bottom of the canal and to fix a lot of the problems that I discussed and the problems I see in that reach.

(Tr. at 412.)

Mr. McKrola testified that in his opinion an access road is necessary to "properly operate and maintain [the canal]." (Tr. at 415.)

Mr. Don Wood testified as the director of information technology for Wasatch County. He provided foundation for Exhibit D which, as described above, is an estimate of the property damage that could occur in the event of a catastrophic breach of the canal on the McClellan property. It estimates the monetary damages to be approximately $34,000,000.00.

Mr. Larry Hartley testified as the area manager for the Wasatch County Water Efficiency Project. Mr. Hartley testified about the day-to-day responsibilities he has regarding the operation and maintenance of all of the canals within the Wasatch County Efficiency Project, which includes the Wasatch and Timpanogos Canals, and some 70 to 75 miles of pipeline laterals. He is the person responsible for the inspection and operation of all of those pipelines.

Mr. Hartley provided to the court a helpful and thorough account of the recent history of the inspections that are regularly carried out on the canals within his jurisdiction. He explained the in-person, on-foot inspections that are accomplished in the canals when empty of water, and the necessity of also inspecting the canals from outside of the canal. He and his fellow workers look for debris, seepage, the presence of rodents or other burrowing animals such as muskrats

and beavers, and signs of cracks, and any other problems with the banks.  He stated the canals are routinely inspected at least weekly and sometimes more often.  He agreed completely with Mr. McKrola's testimony regarding the sinkhole event on the Lecee property and shared Mr. McKrola's concerns about the McClellan property.

Mr. Hartley left no doubt he is extremely familiar with, and knowledgeable about, the Timpanogos Canal.  He expressed his opinion about the downslope bank on the McClellan property as follows:

> Q.    Do you have an opinion with regard to the adequacy of the earthen banks as the canal traverses the McClellan property?
>
> A.    I do.
>
> Q.    What is your opinion?
>
> A.    I don't feel that the material that is on there - - I mean it was adequate back at the time when the canal was constructed.  It had the potential of serving the people as they needed it at that time, but it was not put in as a permanent thing.
> It hasn't been maintained properly.  It needs to be more stable if you're going to put home underneath it.  My opinion is that that material s not adequate.  It is built on a ledge and there is no way of tying a rocky ledge to that material.  It just does not work.  There is always the potential of seepage between those two zones of material.  I think that is where the seeping is occurring.

(Tr. at 540.)

Mr. Hartley stated an access road is necessary along the canal, including on the McClellan property.  He stated: "you have to be able to monitor what is happening in the canal. You have to be able to monitor what is going on inside the canal.  The safety of being able to inspect it."  (Tr. at 541.)

The defendants' final witness was Dr. Wynn R. Walker, who was designated as an expert witness.  Dr. Walker is currently the senior associate dean of the College of Engineering at Utah

21

State University.  He joined the faculty at Utah State University in 1980, serving for 17 years as department head of irrigation engineering and as chairman of the board of the International Irrigation Center before becoming senior associate dean.

Dr. Walker expressed his opinion on the District's need for side access for maintenance purposes (Tr. at 609), on the need for a thicker bank on the McClellan property in order to install a concrete liner (Tr. at 608), on the need to eliminate deep-rooted vegetation within 20 to 25 feet of the canal, and he opined that the District's prioritization process appeared reasonable.  He stated his opinion of the importance of access to the canal for operation and maintenance procedures.  He testified that an access road is desirable ("as a matter of principle I believe that is the appropriate thing to do") and should be built, if possible.  As support for his position, Dr. Walker referred to a manual of the American Society of Civil Engineers that relates to the operation and maintenance of irrigation canals.  (Tr. at 609.)

Prior to trial, Dr. Walker had visited some sections of the Timpanogos Canal but had not been on the McClellan property.  (Tr. at 617.)

The defendants' case consisted almost entirely of witnesses who were employed by the defendants.  In general they presented evidence that it is reasonably necessary for effective and adequate operation and maintenance of the canal to strengthen the downslope bank of the canal on the McClellan property by making the bank substantially wider.  They also claimed that once the bank was so strengthened it would be necessary and proper to make the bank slightly wider still in order to build a dirt maintenance road on which they would drive trucks and other equipment to regularly inspect the canal, and make repairs as necessary.  The defendants' witnesses had many years of experience with the canal and testified that reinforcing the down-

slope bank and adding a maintenance road are required to keep the canal safe and effective for its water conveying purpose. They also testified about the increased risks that have accompanied the recent growth in the Heber area. They claim that a breach in the area of the McClellan property could cause flooding that could cause as much as $34,835,672 in damages to downstream housing developments.

The defendants witnesses stressed the need for, and their present plans to construct a concrete liner in the canal on the McClellan property. They claim that even with such a concrete liner there will still be substantial risks of breaching and bank erosion on the canal.

The defendants' experts and other witnesses claim that without the access road and the other activities they insist upon, they will be at risk of violating U.C.A. § 73-1-8, which requires them to operate the canal in a safe manner.

**The Court's Decision**

It was apparent, and not surprising, from the evidence to find that the plaintiffs and defendants saw the situation from completely different points of view. The plaintiffs want to enjoy their home and property while accommodating the canal. The defendants simply want to safely operate their canal while accommodating the fact it runs through the McClellan property. Neither side was especially interested in understanding the other side's point of view. The McClellans, after a decade of harmony with the previous canal owner, naturally thought things would continue as they had. The United States, as the new owner in 1998, felt significant changes needed to be made, including their decision to spend some $1,000,000.00 to secure the peace with approximately 50 landowners so they could construct an access road along much of the canal. (Pls.' Ex. 7.)

The plaintiffs' evidence emphasized the historic use of the canal, and the substantial burden a road would have on the McClellan property.

The defendants' evidence emphasized the ever-present safety issues associated with the risk of the breach of a downslope bank on a perched canal, and the need for regular inspection and maintenance of the canal.

In the end, after carefully weighing all of the evidence, the court is persuaded the defendants have met their burden of proof with regard to some of their proposed activities, but not as to others, as further explained below. The court found the defendants' witnesses to be competent and for the most part, credible. Messrs. McKrola, Hartley, and Vidmar are dedicated managers and caretakers of the canal. They appear to have the best of intentions in their desire for an access road and their other proposed projects. The evidence demonstrated that an access road would make their jobs easier and more convenient. They provided plausible explanations for their safety concerns, and educated the court on seepage issues (whether from animals, roots, or a thin bank), maintenance practices, and the possible risks associated with breaches and overtopping. But in the final analysis it was the lack of evidence that had more influence on the court than the presentation of it. There were no engineering studies, or any other studies for that matter, that demonstrated to the court that the situation on the McClellan property is sufficiently problematic to justify the construction of a permanent road. The concerns were real, based on the experiences of the witnesses, but the facts were insufficient to demonstrate a present reasonable need to build a road through the middle of the McClellan property. The defendants insist the downslope bank needs strengthening but they provided no credible reason to believe it is in imminent danger of breaching. One thing is clear, there is no evidence the bank on the

McClellan property has ever breached, not in the past hundred years, and the canal is carrying no more water now than it has ever carried. Nor will it. It is not unreasonable to expect that the same ditch that has handled a maximum of 70 CFS (plus runoff) for more than a century will be capable of doing so for the foreseeable future.

Furthermore, there is no evidence of activity on any property similar enough to the McClellan property to satisfy the court that a road is needed for access on the McClellan property based on the prospect of a serious breach. Nor was there sufficient evidence that existing access is inadequate to respond to any reasonably foreseeable emergencies and other conditions as they may arise on the McClellan property.

Before addressing further the proposed road and the other issues in dispute, it may be helpful to recognize those that are not. The parties have no disagreement that:

1) The defendants have the right to install a concrete liner in the canal;

2) The defendants have the right to enter onto the McClellan property for regular operation and maintenance activities, which includes both in-prism maintenance and also the clearing of weeds, debris and other obstructions from the banks of the canal; and

3) The defendants have the right to enter onto the McClellan property to reasonably respond to emergencies and other canal events that require immediate attention.

With that framework in place, the court will now provide answers to the following questions that address the issues that are in dispute:

1) In connection with installing the concrete liner, may the defendants perform the installation work both from inside and outside of the canal prism? The answer is "yes." The court finds that the defendants have proven by a preponderance of the evidence that it is

reasonably necessary to perform construction activities related to the installation of the concrete liner from staging areas both inside and outside of the canal.  Such activities shall be performed in a manner to do as little harm as possible, both in terms of time and space, to the McClellan property and on the condition that the occupied land shall be restored to a condition that is as good as, or better than, the condition of the property before the installation.

2) While the defendants are installing the concrete liner, may they reinforce and widen the downslope bank?  The answer is a qualified "yes."  The court finds that the defendants proved by a preponderance of the evidence that it is reasonably necessary for the defendants to provide additional strength and width to the downslope bank of the canal, but only on the condition that this is done while they are already on the McClellan property for the purpose of installing the concrete liner.

Standing alone, the evidence regarding the inadequacy of the downhill bank was not sufficient to persuade the court that it would be reasonably necessary for the defendants to go upon the serviant estate only to strengthen the downhill bank.  There was a great deal of speculation about the thinness of the bank and, as stated above, accompanied by apparently genuine concern, and there was some evidence of minor seepage from the bank.  But there was not enough evidence presented by the defendants to establish a present need to enter and burden the McClellan property for the sole purpose of strengthening and widening the downslope bank. The evidence regarding the inadequacy of the downhill bank was usually presented only in connection with evidence in support of the need for the proposed road.  There was no independent analysis of how weak the bank is, and how much it would need to be strengthened to meet safety concerns.  Exhibit 3 is a good example of this.  It delineates the parameters and

slope of the proposed road and inferentially indicates a need to have a wider bank to support the road.  But there was no attempt to independently assess the alleged weakness of the bank.

However, in light of the fact that there will be significant temporary disruption to the McClellan property in any event when the defendants install the concrete liner, the court is persuaded that there was sufficient evidence presented of the safety value associated with a slightly thicker downslope bank that a project to strengthen the downslope bank is reasonably necessary, if performed while the servient estate is already being occupied for the installation of the concrete lining.  Consistent with the court's understanding of defendants' Exhibit 3 and the other testimony presented by defendants at trial, the downhill bank's width may be strengthened and extended by no more than 2 feet on the top of the bank.

3) May the defendants build an access road through the McClellan property?  As stated previously, the answer is "no."  The court finds that the defendants failed to prove by a preponderance of the evidence that their canal easement includes the right to build the proposed road through the McClellan property.  There was insufficient evidence that it is reasonably necessary for the defendants to have an access road parallel to the canal on the McClellan property for the purpose of operating and maintaining the canal.  The defendants demonstrated that an access road would make operating and maintaining the canal more convenient, but not necessary.  As already indicated, the court found the defendants' witnesses to be competent care takers of the canal, and to have the best of intentions in their desire to construct an access road, but there simply wasn't enough evidence to convince the court that such an additional use of the plaintiffs' property is reasonably necessary.  This is the court's view even without considering the burden such a road would place on the servient property.

The court agrees with the plaintiffs that it is highly unlikely the plaintiffs' predecessors in interest would have considered an access road to be necessary for proper operation of the canal.

When the court considers the burden such a road would place on the McClellan property, the case against the defendants' proposed road is even stronger. The proposed road would constitute a substantial burden to and considerably diminish the quiet enjoyment of the property by the McClellans or any subsequent owners. A twelve to fifteen foot wide road next to the canal would considerably alter the McClellan property. While the access road that has been constructed on the other properties along the canal may (or may not) have relatively little effect on those properties, a road running through the McClellan property would have an enormous effect on the McClellan property. At present the McClellans have a peaceful 5-acre estate with an excellent view of the valley and a canal that meanders through it. If the proposed road was built, the McCellans would have a 5-acre property with a dirt road that cuts through the middle of it – a dirt road fifteen feet wide with green metal gates at both ends. Based on the court's pre-trial visit to the McClellan property, the negative effect that the proposed road would have on the property is difficult to overstate. The road would be wider than the canal, and it would have its own sloping downhill bank that would make it even wider. From both a functional and esthetic standpoint, the effect to the landowner would be devastating.

The court can understand why the defendants would like a road, but it is neither necessary nor reasonable when one looks at the situation independently with an effort to understand the issue from both sides of the dispute.

This finding is amplified by the evidence, as noted above, that the Timpanogos Canal has had very little, if any, major failures or breaches in its entire history. There was evidence of an

occasional minor breach and some seepage and sink holes on either side of the subject property, but these were all dealt with by the canal owner in a way that did not suggest an access road is necessary on the entire 12-mile length of the canal.

Furthermore, it was clear from the evidence that in several places along the canal there is no access road, and most likely never will be. The defendants have shown a willingness to accommodate other landowners with access points other than an adjacent road. Given the operation and maintenance history on the canal as it runs through the McClellan property, the evidence did not demonstrate that the defendants could not effectively deal with any reasonably foreseeable emergencies on the McClellan property without the added convenience of an access road.

This finding is also based on the undisputed fact that a concrete liner will be installed in the canal on the McClellan property. The court found the defendants' witnesses testimony lacking in credibility when they testified that even with a cement lined canal the safety issues related to seepage would not be significantly diminished. Similarly the court found unpersuasive the defendants' testimony that even with the cement lining in place they would need to significantly strengthen and widen the downslope bank (and, incidentally, do so in a manner that would allow construction of an access road). Again, there were no engineering studies, soil tests, or any other credible evidence to support such a claim.

 The defendants' testimony about the risks of a catastrophic breach of the canal on the McClellan property were for the most part pure speculation. It is undisputed that the amount of water in the canal is controlled, and will not change. And there was no evidence presented that runoff water that collects in the canal will be different in the future. The increased safety

concerns are primarily associated with the changes in the surrounding community, such as more houses and a larger population. While those factors may suggest larger losses if there were a breach of the canal, there was no evidence presented these changes make the canal weaker. They don't add water to the canal. They don't weaken its banks, particularly not on the McClellan property.

Moreover, from a safety standpoint the court was persuaded that a road alongside the canal may actually present a greater safety risk. As the plaintiffs' expert testified, a road provides access, which usually causes people (both authorized or unauthorized) on foot and in motor vehicles, such as 3-wheelers and other recreational vehicles, to use the road, which increases the possibility of physical injury or death from drowning in the canal. Access is access. The defendants choose to focus only on immediate and convenient access to the canal for their maintenance purposes and for responding to emergencies. But a road may also attract the wrong kind of access.

4) May the defendants require the removal of deep-rooted vegetation near the banks of the canal? The answer is "yes." The court is persuaded by Dr. Walker's and the defendants' other witnesses' testimony that there are sufficient concerns related to deep seated roots associated with certain types of trees and other foliage that it is reasonably necessary for the canal owner to prohibit such root systems within 20 feet of each side of the center line of the canal.

5) With regard to the trespass claims, the court finds the defendants have failed to prove by a preponderance of the evidence that the McClellans' activities relating to their garage, trees and shrubs interfered with the canal easement. With regard to the trees, there was insufficient

evidence to show that they were deep-rooted, or, if they are deep-rooted, that they were causing seepage or otherwise improperly interfering with the canal easement at the time in question. The McClellans were entitled to "use their property in any manner they please[d] so long as they [did] not unreasonably restrict or interfere with" the defendants' use of its easement or access thereto. *North Union Canal Co. v. Newell*, 550 P.2d 178, 181 (1976 Utah).

6) Similarly, the court finds the defendants failed to meet their burden of proof, by a preponderance of the evidence, that the McClellans' trees constituted a public nuisance. There was insufficient evidence to show that in planting the trees the McClellans acted unreasonably so as to prevent access to the canal or interfere with its operation or maintenance activities. There was insufficient evidence to show that the trees in question are of the deep-rooted variety, or, even if they are, whether the roots were interfering with the canal before or at the time of trial. To the extent the trees are found in the future to constitute the type of deep-rooted trees referred to in number 4 above, they may be dealt with accordingly.

The court adopts the foregoing as its Findings of Fact and Conclusions of Law.

IT IS SO *ORDERED*.


DATED this 1st day of March, 2011.

BY THE COURT.

Dee Benson
United States District Judge